UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------------

KIRYAS JOEL ALLIANCE; CONGREGATION BAIS
YOEL OHEL FEIGE; ZALMAN WALDMAN; MEYER
DEUTSCH; BERNARD TYRNAUER; ISAAC SRUGO;
JOSEPH WALDMAN; MOSHE TENNENBAUM;
DAVID WOLNER; and JOELWALDMAN,

                                   Plaintiffs,

            -against-

VILLAGE OF KIRYAS JOEL; JACOB REISMAN, Village
Trustee, sued in his official capacity; MOSES GOLDSTEIN,
Village Trustee, sued in his official capacity; JACOB FREUND,
Village Trustee, sued in his official capacity; SAMUEL
LANDAU, Village Trustee, sued in his official capacity;
ABRAHAM WEIDER, Mayor of the Village of Kiryas Joel,
sued in his official capacity; MOSES WITRIOL, Director,
Village of Kiryas Joel Department of Public Safety, sued in
his individual and official capacities; CONGREGATION YETEV LEV
D'SATMAR OF KIRYAS JOEL; DAVID EKSTEIN; TOWN OF
MONROE; and CESAR A. PERALES, sued in his official capacity
as acting New York State Secretary of State,

                                Defendants.

-------------------------------------------------------------------------------------

11-cv-03982 (JSR)

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

      By and through their attorneys, Sussman and Watkins, Plaintiffs complain of Defendants

as follows:

## **NATURE OF THE ACTION**

      1. Defendant VILLAGE OF KIRYAS JOEL (hereinafter "KJ" or "the Village"), is a

theocracy.  The affairs of its government are inherently infused by, and entangled, with religion

such that its very existence as a municipality violates the Establishment Clause of the First

Amendment to the United States Constitution, as made applicable to the states by the Fourteenth

Amendment.

2. Defendant CONGREGATION YETEV LEV D'SATMAR OF KIRYAS JOEL, INC. (hereinafter "CYL-KJ"), which represents the Village's majority religious faction, has irretrievably commandeered the Village government and uses it to advance the Congregation's agenda. As such, the Village misuses municipal authority to discriminate against non-CYL-KJ members (comprising the Village's "dissident" population) on the basis of their religious beliefs, which diverge from those decreed by CYL-KJ's Grand Rebbe Aron Teitelbaum and embraced by his followers.

3. Due to of this inherent and unavoidable entanglement between religion and government, the Village has engaged, and continues to engage, in religious discrimination by, <u>inter alia</u>, (1) selectively enforcing its laws in favor of CYL-KJ and its members and in a manner oppressive to the "dissidents"; (2) disparately treating the "dissidents" with respect to, among other things, property taxation, municipal fees, and enforcement of building and zoning laws; (3) selectively enforcing, among other laws, its littering, noise, and public order ordinances; and (4) engaging in voter fraud and intimidation to ensure that no "dissident" is elected to serve in the Village government.

4. The Village employs its Department of Public Safety ("hereinafter KJPS") to facilitate its discriminatory practices. KJPS misuses its law enforcement authority to selectively enforce laws for the purpose of advancing CYL-KJ's agenda and repressing the "dissidents."

5. Plaintiffs are individuals and organizations who represent the "dissident" population in the Village and have been discriminated against or otherwise harmed (or represent others who have) on the basis of their religious beliefs as a result of CYL-KJ's control of the Village government and the Village's selective and discriminatory enforcement and application of laws against them.

6. Plaintiffs bring this action under the First and Fourteenth Amendments to the United States Constitution for the purpose of dissolving the Village and otherwise redressing their grievances through the attainment of declaratory, injunctive, and monetary relief.

7. Dissolution of the Village is warranted because of the inherent and unwavering conflict that exists in the Village, as set forth with particularity in this Complaint, between the rule of law in a secular democratic society and theocratic rule, which gives primacy and credence to the edicts of a single religious leader without respect to juridical boundaries.

### JURISDICTION

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the First and Fourteenth Amendments to the United States Constitution, and therefore involves the resolution of a federal question.

9. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(3) & (4) and 42 U.S.C. §§ 1983, 1985, and 1988, as this action seeks to redress the deprivation of federal civil rights under color of state law.

### VENUE

10. Venue properly lies within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged in this action occurred in the County of Orange, State of New York, which is within the jurisdiction of the Southern District of New York.

## PARTIES

Plaintiffs

11. Plaintiff KIRYAS JOEL ALLIANCE (hereinafter "KJ Alliance") is an unincorporated, nonprofit association of individuals and organizations, whose primary mission is the promotion of social welfare by advocating for the rights of the citizens of Kiryas Joel.  Many of its members are "dissidents" who reside in the Village and, therefore, are subjected to the Village's discriminatory conduct or otherwise harmed by its unlawful entanglement with CYL-KJ.

12. Plaintiff CONGREGATION BAIS YOEL OHEL FEIGE (hereinafter "Cong. Bais Yoel") is a nonprofit religious corporation, duly organized and incorporated under the laws of the State of New York.  It is a "dissident" congregation and its principal place of business, and primary place of worship, is located in the Village at 12 Garfield Road, Monroe, New York.

13. Plaintiff ZALMAN WALDMAN is a "dissident" and a resident and domiciliary of the Village.  He is also the President of Plaintiff Cong. Bais Yoel.

14. Plaintiff MEYER DEUTSCH is a "dissident" and a resident and domiciliary of the Village.  He is also the Vice President of Plaintiff Cong. Bais Yoel.

15. Plaintiff BERNARD TYRNAUER is a "dissident" and a resident and domiciliary of the Village.  He is also the Secretary of Cong. Bais Yoel.

16. Plaintiff ISAAC SRUGO is a "dissident" and a resident and domiciliary of the Village. He has relatives who recently married without the consent of CYL-KJ's Grand Rebbe Aron Teitelbaum in a new wedding hall located outside of the Village.

17. Plaintiff JOSEPH WALDMAN is a "dissident" and a resident and domiciliary of the Village.

18. Plaintiff MOSHE TENNENBAUM is a "dissident" and a resident and domiciliary of the Village.

19. Plaintiff DAVID WOLNER is a "dissident" and a resident and domiciliary of the Village.

20. Plaintiff JOEL WALDMAN is a "dissident" and a resident and domiciliary of the Village.

Defendants

21. Defendant VILLAGE OF KIRYAS JOEL is a municipal corporation, duly organized and incorporated under the laws of the State of New York.

22. Defendant JACOB REISMAN is a Village trustee and a resident and domiciliary of the Village. He is sued in his official capacity only.

23. Defendant MOSES GOLDSTEIN is a Village trustee and a resident and domiciliary of the Village. He is sued in his official capacity only.

24. Defendant JACOB FREUND is a Village trustee and a resident and domiciliary of the Village. He is sued in his official capacity only.

25. Defendant SAMUEL LANDAU is a Village trustee and a resident and domiciliary of the Village. He is sued in his official capacity only.

26. Defendant ABRAHAM WEIDER is the elected Mayor of KJ and, as such, is the chief executive of the Village. He presides at the meetings of the Village Board of Trustees (hereinafter the "Village Board") and is charged with enforcing the Village's laws and carrying out all other duties provided by, and consistent with, the laws of the State of New York.

27. Defendant Weider also holds a high-ranking position in CYL-KJ known as "Rosh H'Khal," which means "Head of the Congregation." Before holding this position, he was CYL-

KJ's President or Vice President for over a decade.  He is a resident and domiciliary of the Village and is sued in his official capacity only.

28. Defendant MOSES WITRIOL is the appointed Director of the Kiryas Joel Department of Public Safety (hereinafter "KJPS") and, as such, is the Chief Constable.  He is charged with overseeing and managing the affairs of KJPS and its officers consistent with Village law and the laws, rules, and regulations of the State of New York.  He is sued in both his individual and official capacities.

29. Defendant CYL-KJ is nonprofit religious corporation duly organized and incorporated under the laws of the State of New York.  It is the main congregation of the Village and its members comprise the Village's main religious faction.  The Congregation's main synagogue is located at 12 Garfield Road in the Village and it is led by non-party Grand Rebbe Aron Teitelbaum.

30. Defendant DAVID EKSTEIN is the President of CYL-KJ.  Upon information and belief, he is a resident and domiciliary of the Village.  He is sued in both his individual and official capacities.

31. Defendant TOWN OF MONROE (hereinafter "Monroe" or "the Town") is a municipal corporation, duly organized and incorporated under the laws of the State of New York.  The Village is geographically situated wholly within the Town.  If this Court finds that the Village's existence, or the State's recognition of such, is unconstitutional and, thus, its municipal status void, the Town will be required to provide public services to the Village's residents.  Therefore, the Town has a direct interest in the outcome of this matter and is a necessary party.

32. Defendant CESAR A. PERALES is the acting New York State Secretary of State and, as such, is the official charged with managing the affairs of the New York State Department of State.

33. Defendants Village, Reisman, Goldstein, Freund, Landau, Weider, and Witriol are hereinafter collectively referred to as the "Municipal Defendants."

34. Defendants CYL-KJ and Ekstein are hereinafter collectively referred to as the "Congregational Defendants."

## KEY NON-PARTIES

35. Gedalye Szegedin is the appointed Village Clerk and Administrator of KJ and, as such, is subject to the direction and control of the Village Mayor. He is charged with, among other things, keeping the official records of the Village and otherwise carrying out the duties set forth by Village law and the laws of the State of New York. He also holds other official Village positions, including but not limited to, Village Assessor and Chief Election Official.

36. Aron Teitelbaum is the Grand Rebbe of Kiryas Joel and, as such, is the leader of CYL-KJ and its religious educational system the United Talmudical Academy ("UTA").

37. UTA is CYL-KJ's religious educational system. It is comprised of several private religious schools and has an enrollment of over 5,000 students, from pre-school to post-graduate levels. UTA students do not receive a traditional secular education, but rather are instructed primarily in Jewish law and tradition, including Torah and Talmudic studies.

38. Kiryas Joel Union Free School District (hereinafter "KJUFSD") is a public school system created by a special statute enacted by the New York State legislature in the 1990s. Upon information and belief, KJUFSD's boarders are co-terminus with the Village. The District has

an enrollment of approximately 250 special needs students and provides busing and other services to UTA's 5,000-plus students.

## FACTUAL ALLEGATIONS

### BACKGROUND OF THE VILLAGE OF KIRYAS JOEL

39. The Village is located entirely within the borders of the Town of Monroe, County of Orange, State of New York.

40. The Village was founded by the late Grand Rebbe and founder of the Satmar Hasidic movement, Joel Teitelbaum, and duly incorporated in 1977.

41. Since its inception, the Village has remained an enclave for followers of the Satmar Hasidic sect of Judaism. Upon information and belief, the Village is populated entirely by the Satmar Jews or affiliated Hasidim.

42. The Satmar practice an ultraorthodox form of Judaism, which involves, among other things, studying the Torah and Talmud from an early age, strictly following Jewish law and tradition, separating the sexes in public, faithfully observing the Sabbath, and eating a kosher diet.

43. The Satmar generally speak Yiddish as their primary language, marry at young ages, and have large families.

### BACKGROUND OF CONGREGATION YETEV LEV D'SATMAR OF KJ

44. CYL-KJ is the majority congregation KJ and its members comprise the majority religious faction in the Village.

45. After the death of Joel Teitelbaum, his nephew Moses became Grand Rebbe; when Moses passed away, his son Aron took over as Grand Rebbe based on the desire of those in control of KJ and CYL-KJ.

46. Aron Teitelbaum's brother, Zalman, runs the main Satmar congregation in Williamsburg, Brooklyn.

47. As the official KJ Grand Rebbe, Aron Teitelbaum runs both CYL-KJ and the UTA, which has an enrollment of over 5,000 students, including, upon information and belief, the children of all Village government officials who, upon information and belief, are all CYL-KJ members.

### BACKGROUND OF THE "DISSIDENT" MOVEMENT AND RECENT CONFLICT

48. The "dissidents" are comprised of a population of KJ residents, and other Satmar, who do not approve of Aron Teitelbaum's leadership over CYL-KJ and KJ's Satmar population generally.  Upon information and belief, the "dissident" population in KJ represents about forty percent of the total Village population, but still constitutes a minority.

49. Many of the "dissidents" follow Aron's brother Zalman's teachings and believe that he should be running CYL-KJ instead of Aron.

50. Other "dissidents" do not necessarily follow Rabbi Zalman, but otherwise do not approve of Aron's role as Grand Rebbe.

51. In or about early 2009, the "dissidents" built a new wedding hall just outside of the geographic boundaries of the Village in the Town of Woodbury.

52. Young couples within the "dissident" population began celebrating their weddings in this new hall and were married by Rabbis not sanctioned by Aron Teitelbaum.

53. Aron Teitelbaum and ranking officials of CYL-KJ, including Defendants Ekstein and Weider, have ordered CYL-KJ members to repudiate these weddings and to excommunicate the wedding couples and their families from the community.

54. Also on the orders of CYL-KJ's leadership, members of the community, consisting primarily of young men who attend UTA, have repeatedly littered the streets of the Village with leaflets that contain the images and phone numbers of these wedding couples, their parents, and the rabbis who marry them.

55. The leaflets also contain hateful messages, which call upon Village residents to harass these wedding couples and their families and, in some cases, incite violence.

56. In addition to the leafleting, UTA boys make constant harassing phone calls to these wedding couples and their families, sometimes into the middle of the night.

57. In addition to the leafleting, CYL-KJ has also recently used its standing as a Village resident to close a "dissident" synagogue belonging to Cong. Bais Yoel vis-à-vis application of the Village's zoning laws.

58. The leafleting and closing of Cong. Bais Yoel's shul are but two recent examples of the discord between the two factions, which has existed for decades.

59. Since the Village government is run by CYL-KJ members and is subservient to the Congregation's desires, it uses governmental authority to assist CYL-KJ in repressing the "dissidents" and advancing CYL-KJ's agenda.

### DISPARATE TREATMENT BY THE VILLAGE GOVERNMENT ON THE BASIS OF RELIGION

*Overview*

60. The Village is governed by its Mayor (Defendant Weider) and a board of four trustees.

61. Collectively, Defendant Weider and the Village Board are responsible for, inter alia, (1) enacting and enforcing local laws and ordinances; (2) establishing and implementing Village policy; (3) managing the affairs of the Village; (4) keeping the peace and protecting the public health, safety, and welfare of Village residents; (5) providing public services to Village residents; and (6) otherwise carrying out all other duties provided by, and consistent with, the laws, rules, and regulations of the State of New York.

62. The Village government has misused, and continues to misuse, its governmental authority by enacting, enforcing, and applying laws in a manner favorable to CYL-KJ and its members while simultaneously repressing the "dissidents."

***Disparate Treatment in Property Taxation***

63. Under New York State law, as a municipal corporation, the Village is permitted to levy property taxes against properties located within its geographic boundaries.

64. In so levying property taxes, the Village has treated the "dissidents" differently and less favorably than CYL-KJ members.  This disparity applies primarily to exemptions.

65. Under New York law, property owned by a religious corporation and used exclusively for religious purposes is exempt from property taxation. See N.Y. Real Property Tax Law ("RPTL") § 420-a(1).

66. In addition, property owned by a religious corporation and "actually used by the officiating clergymen thereof for residential purposes shall be exempt from taxation." See Id. § 462.

67. In applying religious exemptions, the Village has discriminated against the "dissidents."

68. For instance, Rabbi Samuel Eisenberg leads Congregation TA of KJ, a "dissident" congregation in KJ.

69. Congregation TA of KJ is located at 2 Shinev Court, where Rabbi Eisenberg also resides.

70. Rabbi Eisenberg incorporated his congregation in or about 1999 and applied for property tax exemption shortly thereafter.

71. Although Rabbi Eisenberg was granted exemption from Town and County taxation, the Village denied his request and continues to levy Village tax against the property.

72. After Rabbi Eisenberg persistently complained and requested full exemption, the Village conceded somewhat and provided a 50% exemption in or about 2004.

73. The dollar amount assessed as a Village tax is relatively low compared to that assessed by KJUFSD as a school tax.

74. Historically, KJUFSD's school tax was based on the Town of Monroe's tax roll, and so, "dissident" properties, whose exempt status had been removed from the Village roll but remained on the Town's tax roll, were not assessed a school tax.

75. Accordingly, Rabbi Eisenberg, although wrongfully assessed a Village tax, was historically not required to pay school taxes because his property remained exempt on the Town's tax roll.

76. In or about August 2009, KJUFSD changed its taxation policy so that, instead of using the Town of Monroe's tax roll, it began levying taxes based on the Village's tax roll.

77. As such, Rabbi Eisenberg (and others similarly situated) began receiving tax bills for KJUFSD school tax and his property tax liability increased significantly.

78. In addition to his taxation by the Village and the KJUFSD, Rabbi Eisenberg's exemption was removed from the Town of Monroe's tax roll at the end of 2009 or the beginning of 2010.

79. Upon information and belief, Rabbi Eisenberg's exemption from the Town's tax roll was removed along with about fifty other such properties, which had been flagged for removal due to a confluence of two events – (1) the fact that Szegedin had removed such properties' exemptions from the Village tax roll and (2) the scrutiny by the County following the public exposure of the fact that two large commercial properties in KJ had received Town tax exemption for years.

80. Upon information and belief, when the County recognized that Szegedin had removed several properties from the Village's tax roll but that such properties remained exempt on the Town's tax roll, it directed the Town assessor to summarily remove those same properties from the Town's tax roll.

81. Upon losing his Town tax exemption, Rabbi Eisenberg contacted the Town Assessor, who, shortly thereafter, restored the Town's complete exemption of the property.

82. As a result, Rabbi Eisenberg's property is wholly exempt from Town and County taxation, but wrongfully remains subject to Village and School tax on 50% of its assessed value.

83. Upon information and belief, the Village similarly discriminates against other "dissident" congregations with respect to property tax exemptions by failing to provide the exemptions to which those congregations are so entitled under state law.

84. The Village's otherwise inexplicable decision to refuse to provide such property tax exemptions to "dissident" congregations is motivated by its animus toward the "dissidents'" religious beliefs.

85. CYL-KJ's main synagogue, located at 12 Garfield Road Monroe, New York, is wholly exempt from all property taxation.

86. Upon information and belief, CYL-KJ runs several synagogues, apart from its main synagogue, in the Village.

87. Most, if not all, of CYL-KJ's other synagogues in the Village are exempt from Village property tax, KJUFSD tax, or both, whether or not they are also exempt from Town and County taxation.

88. Upon information and belief, at the same time that the Village taxes the "dissident" congregations that should be entitled to exemption under state law, it provides exemptions to certain CYL-KJ-owned or affiliated properties, even where such exemptions are improper and illegal.

89. For example, the property located at 12 Eahal Court, Monroe, New York, is owned by CYL-KJ and is wrongfully exempt from all property and school taxation.

90. Upon information and belief, Aron Teitelbaum used to, but no longer does, reside at 12 Eahal Court (he now lives at 5 Sanz Court), and, as a result, the property is no longer used as a rabbinical residence or for exclusively religious purposes.

91. The Village has a large commercial shopping center and a business center, both of which are owned by subsidiaries of the UTA – the shopping center is owned by UTA of KJ, SC, Inc. and the business center is owned by UTA of KJ, BC, Inc.

92. The shopping center was opened in 1987 and the business center in 2008.  Both properties were historically exempted from all property and school taxation until these exemptions became public knowledge in or about early 2010 and the Town eliminated them.

93. Though the shopping center and business center are subject to Village property tax, the 2010 Village tax roll indicates that both properties are exempt from school tax.

94. In terms of dollar amount, KJUSFD school taxes represent the largest portion of property taxation in the Village.

95. The Village was supposed to hold its property tax Grievance Day on February 15, 2011, but failed to do so.  Upon information and belief, Grievance Day was not held until April 1, 2011.

96. The Village publishes the status of its tax roll and the right of public review and grievance as required by state law in the *Photo News*, a small English-language Monroe-Woodbury-Harriman publication.

97. It is known by the Village leadership responsible for such publication that the *Photo News* does not have a large circulation in the Village and is not widely read by KJ residents, who primarily read Yiddish-language newspapers.

98. As a result of the Village's publication practices, the Village does not properly publish property tax information as required by state law.

99. Upon information belief, no "dissident" participated in the Village's April 1, 2011 Grievance Day.

***Selective Enforcement of Village Noise and Public Order Ordinances***

100. The Village has enacted two ordinances to regulate the time, place, and manner of public speech in KJ.

101. The Noise Ordinance regulates the projection of sounds in public and, in particular, the use of loudspeakers.

102. The Public Order, Peace and Tranquility ("Public Order") Ordinance regulates mass gatherings, parades, and processions.

103. Each ordinance prohibits certain types of expressive activities if conducted without a permit.

104. Through KJPS, the Village selectively enforces these laws in a manner that facilitates CYL-KJ rhetoric while chilling "dissident" speech.

105. For instance, on Thursday May 28, 2009, Plaintiff Joseph Waldman called the state police to warn that CYL-KJ was planning a big celebration for that Saturday evening, May 30, 2009 and that the Congregation was setting up loudspeakers to play music at night at the main CYL-KJ shul.

106. Mr. Waldman lives across the street from the main CYL-KJ shul and was concerned about the noise disturbing him and his family.

107. The state police told Mr. Waldman that they were notified by Defendant Witriol that CYL-KJ would stop the music by 9:00pm.

108. At 10:45pm on May 30, 2009, Mr. Waldman called the state police again because, in fact, by that hour CYL-K was continuing to play music very loudly

109. The state police told Mr. Waldman that they were informed by Defendant Witriol that CYL-KJ had a permit and that their "higher ups" ordered them to direct Mr. Waldman to KJPS if he had any problems.

110. The state police told Mr. Waldman that they are not authorized to enforce local ordinances, but the Village's Noise Law explicitly permits enforcement by, inter alia, "the New York State police." See Code of the Village Kiryas Joel ("KJ Code") §92-6.

111. The Village Noise Law prohibits, inter alia, the "use of any sound device, loudspeaker or amplifier in such a manner that the sound is projected directly therefrom outside of any building or out-of-doors" unless a permit is granted by the Board of Trustees. See KJ Code §§ 92-2(L) & 92-4(F).

112. Even if a permit is granted under the Noise Law, "a loudspeaker may be used only between the hours of 12:00 noon and 9:00 p.m." and "no loudspeaker use shall be permitted after 3:00 p.m. on Saturdays or Sundays." See Id. § 92-4(F)(4)-(5).

113. CYL-KJ's use of the loudspeakers at 10:45pm on a Saturday evening violated the Noise Law. In fact, even if it had obtained a permit, which, upon information and belief, it had not, the Congregation still projected noise from a loudspeaker after 3:00pm on a Saturday, which is expressly prohibited even with a permit. See Id. § 92-4(F)(4)-(5).

114. KJPS knew that CYL-KJ was in violation of the ordinance because it was in contact with the state police regarding Mr. Waldman's complaint.

115. Instead of enforcing the law, Defendant Witriol aided CYL-KJ's violation thereof by misrepresenting to the state police that CYL-KJ was in conformity therewith. Thus, he was able to thwart Mr. Waldman's attempt to gain any assistance from the state police.

116. Defendant Village has continued to facilitate CYL-KJ's violation of the Noise Law by allowing it to continue using outdoor loudspeakers in an impermissible manner.

117. On or about June 6, 2011, CYL-KJ started setting up outdoor loudspeakers in preparation of the festivities celebrating the end of the Jewish holiday of Shavuos on June 9, 2011.

118. As he did in years past, Mr. Waldman notified the state police that CYL-KJ was preparing to violate the Noise Law on June 9, 2011 and that he expected that the Village would facilitate these activities as it had done in the past.

119. As in years past, the state police again advised Mr. Waldman that they could not enforce the Village's Noise Law and that he should contact KJPS.

120. Mr. Waldman's attorney drafted a letter to the Village's attorney and the state police Monroe barracks' commanding officer, Lieutenant Frank Keiser, to advise them of CYL-KJ's planned activities.

121. The Village's attorney responded, as did CYL-KJ's attorney.  Both essentially conceded that CYL-KJ's planned use of outdoor loudspeakers facially violated the Noise Law.  They also indicated that the Congregation would continue as planned and that the Village would not enforce the Noise Law against the Congregation.

122. As expected, CYL-KJ held its planned celebration on June 9, 2011 and blared loud music from its outdoor loudspeakers until after midnight, seriously disturbing Mr. Waldman and his family.

123. Mr. Waldman called the state police several times.  The state police advised him that they dispatched a trooper to ask Defendant Witriol to have CYL-KJ lower the volume of the music.  The volume was never lowered.

124. KJPS aided CYL-KJ's violation of the Noise Law on at least two other occasions; both incidents involved CYL-KJ's deployment of trucks to broadcast announcements against the "dissident" weddings throughout the Village.

125. In both incidents, the trucks were driven either by someone hired by CYL-KJ or by a CYL-KJ member directly and the announcements repeated messages contained in the leaflets that are commonly strewn across the Village and in the posters pasted on the walls of all the CYL-KJ shuls.

126. These leaflets and announcements directly target the "dissidents" and call for the excommunication of, and violence toward, those who marry in the new wedding hall.

127. The announcements also incite violence as at least one of the messages announced that the people should give the rabbis who preside over the weddings "100 smacks."

128. On Sunday February 7, 2010, Defendant Witriol escorted a truck, which was broadcasting anti-"dissident" announcements, around the Village.  The truck was registered to the UTA.

129. Mordechai Wolf Braver blocked the truck with his own car, and when he did so, Defendant Witriol approached him and demanded that he move so the truck could continue.

130. By that time, many other cars arrived on the scene and Braver could not move his car.

131. Though the road was completely blocked with cars and people outraged by the announcements, and despite many "dissidents" having called the state police for assistance, Defendant Witriol encouraged the state police not to intervene; he told them via radio, "be advised: they blocked in a truck; no violence going on at this time; I'm on scene with two of my guys; the units coming in, they could slow down."

132. The state police finally arrived.  They dispersed the crowd within a few minutes, wrote the truck-driver several tickets, and towed the truck away.

133. On another occasion, in or about April or May of 2009 CYL-KJ hired a truck to drive around the Village announcing an event in Brooklyn in protest of Rabbi Zalman Teitelbaum.

134. Joel Lieberman and Plaintiff Joseph Waldman blocked the truck and called the state police.

135. Mr. Lieberman asked the driver if he had a permit and the driver responded that he did not and that Defendant Witriol advised him that he did not need one.

136. The state police advised Mr. Lieberman that Defendant Witriol had granted permission for the truck to drive around making such announcements.

137. While the Village and KJPS acquiesce in, and, in some cases, affirmatively aid, CYL-KJ's public demonstrations despite hateful and inciting messages and blatant violations of Village law, they use their governmental authority to prevent the "dissidents" from exercising their rights to publically assemble and demonstrate.

138. In early November 2009, the "dissidents" were denied a permit to gather in protest outside of Aron Teitelbaum's residence at 5 Sanz Court.

139. On November 2, 2009, Plaintiff Moshe Tennenbaum called the Village to request such a permit and Aron Schreiber, the Village's Human Resources personnel, told him that he needed to apply in writing.

140. Tennenbaum complied by sending a letter to Schreiber indicating the date, time, location, and purpose of the protest.

141. Thereafter, Defendant Witriol hand-delivered a letter to Tennenbaum, explaining that he needed to comply with the relevant provisions of the Village's Noise and Public Order laws in applying for a permit.

142. The next day, November 3, 2009, Tennenbaum sent a letter directly to Defendant Weider, again requesting a permit and further describing the "dissidents'" plight and the importance of their ability to exercise their First Amendment rights to freely assemble and protest.

143. That same day, the Village's attorney sent Tennenbaum a letter explaining that his prior requests were insufficient to apply for a permit and that he needed to supply the information required by Village law to properly apply.

144. That evening, Tennenbaum forwarded to the Village the required information on an application form he received from Defendant Witriol the prior day.

145. Because the Village did not have a specific application form for a permit request under the Noise and Public Order laws, the form Defendant Witriol provided was a blank form entitled "Village of Kiryas Joel Application for Site Plan Approval[,] Subdivision Approval and/or Special Use Permit" – in essence, a land use application.

146. Tennenbaum indicated that the application was for a "Protest Permit" and disregarded the irrelevant portions of the form.  He also added an additional page, indicating the date, time, location, and purpose of the protest for which he was requesting a permit.

147. The following day, November 4, 2009, Tennenbaum sent another letter to the Village requesting expedition of his permit application given that the protest was planned to occur that day.  Styled a "Third & Last Request," the letter warned: "We caution you not to play games with us – or our First Amendment Rights!"  The letter also included the entire contents of his November 3 letter.

148. On November 5, 2009, the Village's attorney sent Tennenbaum another letter, advising him that his permit application was incomplete and thus could not properly be considered.  The letter stated further:

> You apparently propose a mass gathering at 5 Sanz Ct, which is a private residence.  Sanz Ct. is a tiny dead-end street which also houses the only ambulance service in the Village, which is dependent on open ingress and egress to serve the needs of the Village.  Also, Sanz Ct. is a residential street serving 22 families, with many children and a 90 year old invalid.  There is no public forum of any kind located on Sanz Ct.  Nor have you provided the permission of any private property owner.
>
> I would suggest that you consider locations where your groups has [sic] already held past protests: along Forest or Bakertown Roads or even Acres Road.  Your group has had many protests exercising its First Amendment rights along these locations without any interference from the Village.  However, now you are proposing a large gathering or parade which would require reasonable

regulation to protect public order – and your interests as well.  For
this reasons [sic] you should provide the kind of information
suggested by the statute.

149. Thus, although not styled a "denial," the November 5, 2009 letter effectively denied

Tennenbaum's permit application.

150. In or about the summer of 2009, Joel Lieberman was prohibited from announcing a

protest that was called for by Rabbi Zalman.  The subject of the protest was the Spanish

government's treatment of Jewish graves in Spain, a topic unrelated to the conflict among the

feuding factions in KJ.

151. Mr. Lieberman had planned to drive through the Village announcing the protest from

loudspeakers, but before doing so went to the Village offices to try to obtain a permit.

152. At first, Mr. Schreiber told him that the Village does not have a department that handles

permits of the kind Mr. Lieberman sought.

153. Mr. Lieberman advised Mr. Schreiber that he needed a permit because, otherwise,

Defendant Witriol would stop him.

154. Mr. Schreiber called Defendant Witriol, who confirmed that a permit was required and

explained that one could only be obtained through approval by the Village Board, and so Mr.

Schreiber advised Mr. Lieberman that he needed to wait for a Village Board meeting to get a

permit.

155. Mr. Lieberman then advised Mr. Schreiber that he was going to conduct the protest

anyway because the Village's conditions were arbitrary and unreasonable.

156. Mr. Lieberman then rented a van, attached loudspeakers, and began driving through the

Village announcing the protest.

157. Soon thereafter, a KJPS officer pulled Mr. Lieberman over in front of 5 Garfield Road and another KJPS vehicle pulled in front of his van to block him from leaving. Defendant Witriol arrived and demanded that Mr. Lieberman turn off the loudspeakers, which were still playing, and to get out of the truck. Lieberman refused.

158. Defendant Witriol then called the state police, who arrived soon after and, upon Defendant Witriol's urging, ordered Mr. Lieberman to exit the vehicle and turn off the loudspeaker with the threat of arrest for noncompliance. Mr. Lieberman complied.

159. Defendant Witriol explained to the trooper that Mr. Lieberman did not have a permit, and obtaining one would take 30 days. He then called the car rental company owner who sent an employee to pick up the truck.

160. His attempt to protest thwarted, Mr. Lieberman left the scene in a friend's minivan.

***Selective Enforcement of Building and Zoning Laws***

161. Under New York law, KJ is authorized to regulate the development and use of land in the Village and of the structures built thereupon. See N.Y. Village Law §7-700.

162. Accordingly, KJ has enacted a comprehensive Zoning Ordinance, codified at Chapter 155 of the KJ Code.

163. The Village selectively enforces its Zoning Law to facilitate CYL-KJ's hostility toward the "dissidents." Further, it appears that the Village regularly dispenses with the requirements of its own Zoning Law, and the State's laws regarding municipal land-use regulation, to advance religious activities, in particular CYL-KJ's.

164. In 2004, CYL-KJ shut off the utilities running to a "dissident" synagogue physically annexed to the back of the main CYL-KJ shul at 12 Garfield Road.

165. That synagogue, owned by Plaintiff Cong. Bais Yoel, was originally built as a residence for CYL-KJ's Grand Rebbe Joel Teitelbaum and his wife Feige (also known as the Rebitzon).

166. In 1981, after the Grand Rebbe passed away, CYL-KJ partitioned the property and transferred the residential portion to the Rebitzon. The Rebitzon transferred that property to Cong. Bais Yoel in 1981, which has since used it as a shul.

167. Upon losing its utilities, Cong. Bais Yoel sued CYL-KJ in State Supreme Court seeking a declaration that it possessed an easement for use of the utilities and an order requiring CYL-KJ to restore them. The suit also sought a declaration that it owned, by adverse possession, the curtilage of the Rebitzon's house.

168. CYL-KJ counterclaimed that Cong. Bais Yoel should be enjoined from using the property as a shul because the property is zoned only for residential use and, thus, Cong Bais Yoel's religious use violated the Village's Zoning Ordinance.

169. State Supreme Court Justice Owen held that Cong. Bais Yoel possesses an easement of necessity for the utilities, but that such easement is appurtenant to a residential use only. He ordered that CYL-KJ turn the utilities back on, but limited to such residential use until the Village approved its use for religious purposes.

170. If Cong. Bais Yoel wanted to reopen the Rebitzon's house as a synagogue, Judge Owen explained, it must apply for, and be granted, a special use permit under the Village's Zoning Law. He also declared that Cong. Bais Yoel owned, by adverse possession, the land surrounding the house that it had fenced in.

171. On appeal, the Second Department affirmed, in substance, Judge Owens' decision, but made two changes to his order: (1) it struck, in whole, a monetary judgment of $744,000 awarded to CYL-KJ for "unauthorized" use of its property for parking by Cong. Bais Yoel

congregants and (2) it clarified that Cong. Bais Yoel needed only site plan approval, and not a special use permit, to reopen its shul at the Rebitzon's house.

172. Although the dispute that led to the closing of Cong. Bais Yoel's shul was between private parties, the Village has involved itself in the matter (in a manner favoring CYL-KJ), even while purporting to remain neutral.

173. Principally, the Village has thwarted Cong. Bais Yoel's attempts to comply with Justice Owen's order (as modified) to reopen its shul.

174. When Cong. Bais Yoel attempted to have an earlier site plan reviewed by the Village's Zoning Board of Appeals ("ZBA"), the Village initially conceded it had no such entity.

175. When the Village created a ZBA, that board's members overlapped with those sitting on the Village's Planning Board, in from sitting on more than municipal board.

176. Thereafter, Village boards have selectively imposed zoning requirements as Cong. Bais Yoel sought to recommence use of the property as a shul.

177. For instance, the Village has required Cong. Bais Yoel to submit Site Plans for Village Planning Board approval before it will allow the Congregation to use its residentially zoned property for religious purposes while, at the same time, not imposing the same requirement on the forty to fifty other similarly zoned residential properties currently used for religious purposes by CYL-KJ members.

178. Plaintiff Cong. Bais Yoel requested that the Village grant it the same approval it has granted for other properties used for religious purposes by CYL-KJ members, but the Village has refused.

179. Plaintiff Cong. Bais Yoel has also requested that the Village impose on the owners of the other properties used for religious purposes by CYL-KJ members the same requirements it has imposed on Cong. Bais Yoel, but the Village has refused.

180. The Village's inability to properly constitute a valid and impartial Planning Board or ZBA, which is not directed by the edicts of Aron Teitelbaum and CYL-KJ leadership, has imposed a substantial burden on Cong. Bais Yoel's ability to use the Rebitzon's house for religious purposes.

181. To date, approval has not been granted and the shul, which had operated continuously from 1981 until it was shut down in 2009, has remained closed.

182. On Sunday June 6, 2010, the Village, through KJPS, facilitated CYL-KJ's physical destruction of Cong. Bais Yoel's property.

183. On that date, at about 6:30 or 7:00 A.M., CYL-KJ commenced a bulldozing operation at the Rebitzon's house, which, among other things, ripped up the curtilage of the property, including a historic stone walkway, tore apart fencing, destroyed part of the porch and other structures, and tore down utility wires running to the building.

184. KJPS was on scene that day for the express purpose of facilitating CYL-KJ's activities.

185. To the extent it occurred before 8:00am, CYL-KJ's construction blitz violated the Village's Noise Law, which prohibits noise emitted as a result of construction activities occurring between the hours of 8:00pm and 8:00am.  Yet, KJPS not only failed to prevent the activity despite this clear violation; it proactively aided CYL-KJ's conduct by providing an armed enforcement authority to prevent the "dissidents" from protecting their property.

186. Plaintiff Joel Waldman, a Cong. Bais Yoel member, was arrested that day and charged with trespass, resisting arrest, assault with intent to cause physical injury, and obstructing governmental administration while standing on his own Congregation's property.

187. KJPS used excess force to detain and arrest Mr. Waldman, as several officers wrestled him to the ground.

188. Once subdued on the ground, one officer twisted Mr. Waldman's foot while another pepper-sprayed him in the face.

189. Lazer Waldman, Joel's cousin, called the Hatzolah ambulance because he witnessed how forcefully Joel was arrested.

190. Upon information and belief, Defendant Witriol, who in addition to directing KJPS is also a member of Hatzolah, canceled the ambulance.

191. During his arrest, Mr. Waldman asked a KJPS officer to show his badge to prove that he had authority to arrest Joel; the officer showed Mr. Waldman his firearm and remarked, in sum and substance, that "if I have a gun, I must be so authorized."

192. The KJPS officer who signed the supporting depositions to the Informations setting forth the charges against Mr. Waldman was Rafael Uriondo.

193. An "Official Training Records Report" from the New York State Division of Criminal Justice Services ("DCJS") dated as of June 17, 2010 (a time period covering the date of the attack on the Rebitzon's house), does not include Rafael Uriondo as a KJPS officer.  Defendant Witriol added Uriondo to the registry in a December 2, 2010 filing to DCJS, in which he indicated that Uriondo was added as a KJPS officer on April 6, 2009.

194. KJPS brought Mr. Waldman to the state police barracks, where he overheard Defendant Witriol and Uriondo talking to the trooper making the police report.

195. Uriondo told the trooper that Mr. Waldman resisted arrest and punched him and that he had twisted his ankle in pursuit of Mr. Waldman.

196. Defendant Witriol then asked Uriondo if he needed an ambulance to take him to the hospital to treat his ankle; Uriondo rejected the offer.

197. Defendant Witriol then pulled Uriondo out of the room and began yelling at Uriondo; when they came back into the room, Uriondo had an exaggerated limp and said that, in fact, he did need an ambulance.

198. Mendel Tyrnauer, who was also arrested that day and was present during Defendant Witriol's conversation with Uriondo, heard Witriol tell Uriondo to ask for an ambulance and to act hurt, even if he was fine.

### *Disparate Treatment in Municipal Fees*

199. The Village charges fees for providing public services, such as sanitation removal and municipal water and sewer services.

200. The Village discriminates against the "dissidents" with respect to these fees.

201. For example, Plaintiff Meyer Deutsch runs a non-profit social services organization at 2 Garfield Road, where he also resides.

202. The organization has a food pantry and provides food for the hungry.

203. In or about 2004, the Village began charging the organization more than $400/month for garbage collection.

204. Despite the organization's hiring of a private sanitation removal company (Waste Management), the Village continued to charge sanitation fees even though it was no longer removing garbage.

205. In 2007 the organization retained counsel and sued the Village in federal court for discrimination in its assessment of sanitation fees, alleging that the Village was not charging similar fees to CYL-KJ members.  During the course of litigation, the parties agreed to a settlement and the plaintiffs voluntarily dismissed the case.

206. The Village has also been charging non-party Congregation Tiv Livov, a "dissident" congregation located at 5 Garfield Road, Monroe New York, for garbage fees, even though the congregation pays a private sanitation company to haul its trash.

207. Upon information and belief, the Village charges other "dissident" congregations for garbage removal when, in fact, these congregations pay a third-party private garbage company to remove its trash.

208. Upon information and belief, the Village has not similarly charged several CYL-KJ shuls or members for garbage removal.

209. For example, the Village does not charge CYL-KJ for municipal water at its main shul at 12 Garfield Road.

210. By further example, the Village does not charge Defendant Rabbi Aron for municipal water at his personal residence at 5 Sanz Court.

***Fraud and Corruption in Village Elections***

211. There is a history of documented fraud and corruption in KJ's Village elections, a central purpose of which is to ensure that no "dissident" is elected to serve in Village government.

212. A Report of the November-December 2001 Grand Jury of the County Court of Orange County, dated June 12, 2002 and entitled in the Matter of Investigation into Certain Alleged Voting Practices in the Village of Kiryas Joel, found a number of fraudulent practices.

213. The Grand Jury confirmed that a number of underage persons, mostly UTA students, voted at the 2001 Village election, the first contested election in Village history.

214. Further, the Grand Jury found that students were provided pre-printed voter registration cards containing inaccurate birth dates and that non-residents were solicited to vote, and, in fact, did vote, in the Village election.

215. In 2004, Plaintiff Kiryas Joel Alliance retained the Honest Ballot Association ("HBA") as a neutral, third-party election monitor.

216. HBA attended the June 2, 2004 Village election and issued a report of its findings on June 16, 2004. The report notes "[w]hile HBA representatives did not witness any major irregularities in such a scope that would affect the outcome of the election, HBA did observe a series of troubling behaviors and practices that warrants to be noted . . . ."

217. Those "troubling behaviors and practices" included, inter alia, (1) instances of registered voters unable to vote because another had already voted under their name; (2) instances of Village election inspectors "deliberately rushing the table in order to create chaos and disorder"; (3) a "Selective Enforcement" policy implemented by election officials, "where the law was applied in full for voter's [associated with the "dissidents"] and overlooked for voters of the other side"; (4) the fact that "the election was predominantly run in a chaotic way to overwhelm, overpower, and overrule the opposition"; (5) "various incidents of intimidation and latent intimidation of voters", including acts of bullying by persons from the ruling party; and (6) the

fact that "the election was run clearly in a partisan manor [sic] (one-sided to the <u>ruling</u> Experience & Results Party)."

218. Village elections are run by the Village Board, the same body affected by the outcome of the elections.

219. Szegedin is the Chief Election Official and the Village Board appoints the entire slate of election inspectors.

220. Village election officials allow underage UTA students to vote.

221. During the 2001 Village election, election inspectors at the polling place were provided food that was wrapped in papers bearing the names of candidates for the governing party printed thereon like a campaign advertisement.

222. Village elections are typically infected with express and blatant intimidation. Joel Lieberman was once arrested at an election while trying to provide monitoring services to ensure fair procedures.

223. Upon information and belief, Village officials bus non-KJ residents in from Brooklyn to vote for governing-party members at Village elections. Upon information and belief, KJPS helps facilitate this practice by allowing the buses through.

224. As the Village elections are run and monitored by the very officials most affected by their outcome, they are infected with conflicts of interest and impartiality.

<u>DISPARATE TREATMENT AND SELECTIVE ENFORCEMENT BY KJPS</u>

*Overview*

225. The Kiryas Joel Public Safety Department was established by Village law as a Constabulary and, as such, is not an accredited police agency.

226. KJPS officers have Peace Officer status and are authorized to make lawful arrests and issue appearance tickets.

227. KJPS is the law enforcement arm of the Village government.

228. Defendant Moses Witriol has been the Director of KJPS since he was hired in or about 2001.

229. Defendant Witriol has consistently misused his authority as KJPS director to favor CYL-KJ and repress the "dissidents."

230. Through its officers and at the direction of Defendant Witriol, KJPS regularly abdicates its responsibility to keep order in the community by allowing mobs of UTA boys to harass and assault groups of "dissidents."

231. Through its officers and at the direction of Defendant Witriol, KJPS has done nothing to prevent CYL-KJ members from littering the streets of KJ with harassing leaflets, despite an existing Village Littering Ordinance and repeated complaints by "dissidents."

232. These leaflets contain the pictures, names, and private phone numbers of "dissidents" whose weddings (or whose children's weddings) are not sanctioned by CYL-KJ's Grand Rebbe, and, if not directly calling for violence, in fact, do incite violence against the "dissidents."

233. Through its officers and at the direction of Defendant Witriol, KJPS has misused its law enforcement authority to facilitate CYL-KJ's destruction of a "dissident" synagogue.

234. KJPS, through its officers and at the direction of Defendant Witirol, selectively enforces public speech laws to facilitate CYL-KJ's rhetoric while preventing "dissident" demonstrations.

***Facilitation of CYL-KJ Harassment of and Aggression toward the "Dissidents"***

235. Throughout the years, members of CYL-KJ have acted aggressively toward the "dissidents." This aggression typically manifests through conduct engaged in by the young men and boys attending the UTA.

236. Within the past few years, there have been several incidents involving mobs of hundreds of these boys, harassing and assaulting "dissident" members.

237. When these mobs convene, KJPS often does not intervene, but rather allows the UTA boys to continue unhindered, forcing the "dissidents" to call the state police to obtain relief.

Srugo Family Assault

238. Late Friday night, August 20, 2010, Plaintiff Isaac Srugo and his family were assaulted by an unruly mob of UTA boys while walking home from a post-wedding religious celebration known as "Sheva Bruchas."[1]

239. Before attending the event, the Srugos were praying in a shul until about midnight.

240. They left the shul to go to the Sheva Bruchas and saw leaflets on the street, which alarmed them.

241. When they came upon Garfield Road, they saw about 30 UTA boys surrounding a vehicle occupied by personnel hired by the KJ Alliance to provide assistance and security to the "dissidents" on Shabbos because KJPS was not properly attending to them. One of the men working for the Alliance that night was Monticello Police Detective Gerard Dietz.

---

[1] Sheva Bruchas is a religious event that is celebrated within the first seven days after a wedding. The Srugos were celebrating this event for a relative who had married in the new wedding hall within seven days prior to this night.

242. The Srugos surreptitiously walked down the side of the road toward the shopping center at Forest Road so as not to be seen by the UTA boys. They were successful and got to the celebration unharmed.

243. At about 1:15am (now August 21st), the Srugos prepared to leave for home, which is usually a relatively quick journey. Their group consisted of about 10-12 family members, one of whom was Mr. Srugo's pregnant daughter.

244. When they emerged onto the street, they saw a mob of about 300 UTA boys.

245. The vehicle hired by the Alliance was nearby and Mr. Srugo asked for an escort home. The Alliance personnel agreed and the family began their walk home.

246. Shortly after leaving, the UTA boys started screaming "Srugo is here," and the mob ran toward the Alliance vehicle.

247. The boys surrounded the vehicle and prevented it from moving any further, prompting Detective Dietz to call the state police.

248. Without the aid of an escort, the Srugos continued to try to make their way home.

249. The family was literally surrounded by hundreds of screaming boys during their journey home, which lasted about 45 minutes.

250. As the family tried to escape, the boys were hitting and kicking them, throwing bottles and eggs, and calling Mr. Srugo's daughter, Miriam, a "Zoina," a Yiddish term roughly equivalent to "prostitute," but carrying an even more negative religious connotation.

251. During the walk home, Mr. Srugo saw several KJPS officers pass by, but none stopped to help; they just ignored the situation.

252. When the family got to Acres Road, they saw two state police cars approach and the mob dispersed. Mr. Srugo asked the state police to escort his family home, or, at the very least, just his daughters.

253. The state police advised Mr. Srugo that they were responding to a call from the Alliance personnel and continued toward that vehicle.

254. Shortly thereafter a few more state police cars arrived.

255. The officers told Mr. Srugo that they would complete a police report if he wanted, but otherwise would not escort him home.

256. Mr. Srugo declined to complete a report at that time, so the state police continued to the Alliance vehicle.

257. The Srugos continued to walk home and could hear the UTA boys yelling in the distance. Mr. Srugo suspected the boys were planning to convene at his daughter's home, so he instructed his entire family to come to his house for safety.

258. When the family got to Lemberg Court, Mr. Srugo spotted a KJPS vehicle. He approached the officer and asked for an escort home. The officer responded, in sum and substance, "Are you crazy? Why should I help you?" He then drove away and followed the police toward Forest Road and the Alliance vehicle.

259. Since the mob had finally dispersed, and the family was unable to secure an escort from any of the state police or KJPS officers they encountered, they ran the rest of the way home.

260. When they arrived, there were about 12 boys outside Mr. Srugo's house yelling at them. Mr. Srugo's neighbors came outside and began yelling at the boys.

261. The state police then arrived at Mr. Srugo's home, instructed everyone to get back into their homes, and demanded that the boys disperse.

262. Later that same day, Saturday August 21, 2010, Mr. Srugo received a harassing phone call at about 10:00pm.  The caller warned that "this is only the beginning."

263.  Mr. Srugo received several more harassing calls that night; the caller-ID indicated that the calls originated from the UTA.  When he complained to the state police, they advised him to either disconnect his phone or change his number.

264. Mr. Srugo made a formal police report of the incident on August 26, 2010.  He was able to identify two "main actors" – Simon Leibowtiz and Israel Ekstein (Defendant David Ekstein's nephew) – who were arrested and charged.

<u>Rabinowitz Assault</u>

265. On Monday evening, December 13, 2010, non-party Rafael Rabinowitz was assaulted by a mob of UTA boys.

266. That evening, Mr. Rabinowitz, who lives near the shopping center on Forest Road, was preparing to go to shul with his friend Shlome Weiss.

267. As he emerged from his house to meet Mr. Weiss, at about 10:00pm, he saw approximately 10 UTA boys throwing leaflets in the streets.  The boys were covering their faces.

268. Shortly thereafter, Mr. Weiss arrived, observed the boys throwing leaflets, and called the state police.

269. While waiting for the police to arrive, Mr. Rabinowitz started taking pictures of the boys, who became agitated and ran toward him.

270. Mr. Rabinowitz began to retreat but then thought he recognized one of the boys.  He asked, "Are you Kahan?" (referring to a boy he knows named Moshe Kahan).

271. The boy appeared shocked that Rabinowitz recognized him and started to run away. As he was leaving, though, he yelled back that he was going to bring the entire yeshiva.

272. Soon after the UTA boys retreated, the police arrived. Mr. Weiss told them that he knew where the boys went, but the police did not seem interested; they drove away, circled the shopping center parking lot, and left the Village.

273. With the boys gone, Mr. Rabinowitz and Mr. Weiss continued with their plans and attended shul.

274. At about 10:30-11:00pm, Mr. Rabinowitz and Mr. Weiss were preparing to leave when Avigdor Nuchem Schlesinger, the synagogue's "shamas" (building manager) warned the people in the shul that there were approximately 50-100 UTA boys outside.

275. Mr. Rabinowitz, Mr. Weiss, and about six others went outside to see what was happening.

276. They saw the UTA boys throwing more leaflets, so Mr. Rabinowitz began taking more pictures.

277. The boys started to approach Mr. Rabinowitz and his group, but Mr. Schlesinger warned the boys not to come any closer because they were on private property.

278. The boys turned around and went back to the other side of the street and began throwing stones at Mr. Rabinowitz's group. Mr. Rabinowitz warned them that he would take more pictures and call the police if they continued to throw stones.

279. Suddenly, the boys, in unison, yelled "1-2-3," and then ran together toward Mr. Rabinowitz, who was still outside of the synagogue.

280. Mr. Rabinowitz started to retreat up the stairs while also taking pictures of the boys charging him.

281. One of the UTA boys, Wolf Landau, ran up the stairs toward Mr. Rabinowitz and tried to grab the camera away from him.

282. Landau threw Mr. Rabinowitz down the stairs.

283. At the bottom of the stairs, Mr. Rabinowitz remained on the ground as a number of UTA boys began kicking him while the rest of the group yelled "melt him!"

284. Mr. Rabinowitz sustained severe physical injury from this attack, including bruises on his head and over his entire body.

285. Mr. Weiss's father, who had left the shul about 15 minutes before this melee started, returned and tried to help, but the UTA boys threw him to the ground as well.

286. Shortly thereafter, the state police arrived and the boys dispersed when they saw the lights and heard the sirens approaching.

287. Mr. Rabinowitz got up and started to chase Landau, who had stolen his camera.

288. Mr. Rabinowitz caught up to Landau, but before he could try to get his camera back, Plaintiff Joel Waldman arrived and pulled Mr. Rabinowitz away.

289. Mr. Waldman was not aware that Landau had beaten up Mr. Rabinowitz and stolen his camera, but he wanted to make sure that Mr. Rabinowitz was not engaged in any sort of scuffle when the police arrived.  Later that evening, Mr. Rabinowitz went to the state police barracks in Monroe to file a police report.

290. In addition to being assaulted, Mr. Rabinowitz suffered a financial loss of almost $1,000 from the theft of his camera, destruction of his glasses, and tearing of his clothing.

291. Although this assault occurred in the streets of KJ, there was no response from any KJPS officer throughout the entire event.

***Selective Enforcement of Village Littering Ordinance***

292. The Village has enacted a Littering Ordinance, codified at Chapter 85 of the KJ Code.

293. The Littering Ordinance makes it unlawful for any person to "throw or deposit litter in or upon any property, either public or private, except in conformity with this chapter." See KJ Code § 85-2.

294. The law also requires private property owners to keep their land clean and free of litter. See KJ Code § 85-9.

295. The term "litter" is defined as "[g]arbage, refuse, rubbish, newspaper, paper and/or all other waste material." KJ Code § 85-1(B).

296. The Littering Ordinance is to be enforced by the "Code Enforcement Officer, Building Inspector and/or any other person authorized by the Board of Trustees." KJ Code § 85-11(A).

297. Since KJPS officers are authorized by Village law to "issue appearance tickets relating to enforcement of any . . . local law [or] ordinance . . . affecting the public health, safety and welfare," see KJ Code § 13-3, they may enforce the Littering Ordinance.

298. Punishment for violating the ordinance includes a series of fines, ranging from $50-$250 depending on the number of offenses, potential imprisonment of up to 15 days, and a series of civil penalties that correspond with the fines imposed for similar offenses.

299. Through its officers and at the direction of Defendant Witriol, KJPS selectively enforces KJ's Littering Ordinance to the detriment of the ""dissidents."

300. This selective enforcement manifests primarily in the context of the periodic leafleting on the streets of KJ by CYL-KJ members protesting "dissident" weddings.

301. On numerous occasions, the streets of KJ have been blanketed with these harassing leaflets, which constitute "litter" under the Littering Ordinance.

302. KJPS does not enforce the ordinance to prevent the leafleting, punish the perpetrators for littering, or even to require property owners to clean the leaflets from their yards and properties.

303. Neither KJPS nor the Village engages in any effort to clean the leaflets from the public streets of KJ.

304. These leaflets are thrown primarily by UTA boys, who do so either on foot or from the windows of cars and even from KJUFSD school buses.

305. Despite its knowledge of the leaflets and the identities of those responsible for leafleting, KJPS does nothing to try to prevent this conduct, such as patrolling the streets for offenders or announcing a campaign against such leafleting like a typical local police force might announce a campaign to crack down on a recurring problem in its community.

306. There have even been incidents where KJPS officers witnessed the leafleting first hand and, despite their ability to stop it and penalize the offenders, did nothing.

307. For example, on or about December 10, 2010, Lipa Deutsch was on Forest Road trying to clean up the leaflets when a group of UTA boys arrived and started to get rowdy.

308. Plaintiff David Wolner, who lives on the corner of Forest Road and Van Buren Drive, heard the noise and saw the boys surrounding Mr. Deutsch and throwing more leaflets, so he left his house to go assist Mr. Deutsch.

309. A KJPS officer was present and Mr. Deutsch asked that the officer order the boys to stop leafleting.

310. The KJPS officer dispersed the UTA boys and told Mr. Deutsch to find him if the boys caused any trouble.

311. After the officer left, Mr. Deutsch and Mr. Wolner could hear the UTA boys assembling by the yeshiva, so they went to the KJPS booth to find the officer with whom they had just spoken, but that officer was not there.

312. Once at the booth, Mr. Deutsch and Mr. Wolner told the officer on duty about the leaflets; the officer looked outside and saw the boys throwing leaflets but then basically ignored the two and closed the door on them.

313. They knocked again and asked for the supervisor.  In sum and substance, the supervisor told them that there was nothing he could do because Defendant Witriol had final authority.

314. In sum and substance, the supervisor also told them that he didn't care if the boys threw leaflets, so long as they didn't get into any physical altercations.

315. On about August 26, 2010, leaflets had been strewn across the parking lot of the Hatzolah garage, right next to KJPS's headquarters.

316. Abraham Friedman, who saw the leaflets there, complained of the leaflets to KJPS via fax and implored it to review any extant video surveillance cameras.  He received no response.

317. In or about August 2010, in response to the leafleting by CYL-KJ members and UTA students, some members of the "dissident" faction threw garbage on the streets to coerce the Village to clean everything up.

318. On August 23, 2010, Joel Frankel signed a supporting deposition, swearing that he saw Plaintiff David Wolner throw a bag of garbage on the street.

319. As a result of this deposition, Wolner was charged with disorderly conduct by the state police by an Information signed by Defendant Witriol as the Complainant.

320. Wolner did not throw any garbage on the street and is currently defending himself against the criminal charge and has incurred significant legal fees in doing so.

321. Upon information and belief, Joel Frankel, who signed the supporting deposition, does not live in the Village and is not a resident of the address listed as his own on the supporting deposition.

### Destruction of Cong. Bais Yoel Synagogue

322. On June 6, 2010, through its officers and at the direction of Defendant Witriol, KJPS fully facilitated CYL-KJ's destruction of Cong. Bais Yoel's synagogue at the Rebitzon's house on 12 Garfield Road, as set forth in paragraphs 182 through 198, above.

### Selective Enforcement of Public Speech Laws

323. On May 30, 2009, through its officers and at the direction of Defendant Witriol, KJPS facilitated CYL-KJ's public demonstration on Garfield Road in violation of the Village Noise Law and despite complaints from Plaintiff Joseph Waldman, as set forth in paragraphs 100 through 115, above.

324. On June 9, 2011, through its officers and at the direction of Defendant Witriol, KJPS facilitated CYL-KJ's public demonstrations on Garfield Road in violation of the Village Noise Las and despite complaints from Plaintiff Joseph Waldman, as set forth in paragraphs 116 through 123, above.

325. In or about April or May 2009, through its officers and at the direction of Defendant Witriol, KJPS facilitated CYL-KJ's public announcements made by a loudspeaker driven around the Village, despite complaints from Plaintiff Joseph Waldman and Joel Lieberman, as set forth in paragraphs 124 through 127 and 133 through 136, above.

326. On or about February 7, 2010, through its officers and at the direction of Defendant Witriol, KJPS facilitated CYL-KJ's public announcements made by a loudspeaker driven around

the Village, despite numerous "dissident" complaints, as set forth in paragraphs 124 through 132, above.

327. In early November 2009, through its officers and at the direction of Defendant Witriol, KJPS facilitated the Village's denial of the dissident's ability to demonstrate against CYL-KJ's Grande Rebbe Aron Teitelbaum by its threat of enforcing the Public Order and Noise laws against them if they attempted to demonstrate without a permit, as set forth in paragraphs 137 through 149 above.

328. In the summer of 2009, through its officer and at the direction of Defendant Witriol, KJPS prevented Joel Lieberman from making announcements from a mobile loudspeaker without a permit, as set forth in paragraphs 150 through 160, above.

*Additional Methods of Selective Enforcement and Disparate Treatment*

329. The Village prints and distributes identification cards to Village residents as a public service.

330. As a matter of policy, the Village refuses to provide such identification cards to "dissidents" who have been married in the new wedding hall.

331. KJPS often facilitates CYL-KJ religious celebrations and other events by, among other things, providing lighting towers and equipment, providing barricades, providing security personnel to staff such events, escorting high-profile attendees, and otherwise supporting the Congregation's activities.

332. Despite requests from "dissidents," KJPS refuses to provide similar support services to facilitate "dissident" celebrations and events.  When UTA boys and other CYL-KJ members

disrupt these events by, among other things, heckling and throwing stones, KJPS fails to respond to stop these disruptions.

333. In or About August 16, 2009, Plaintiff Joseph Waldman came to the aid of his daughter and son-in-law during a scuffle amongst rowdy KJ residents.

334. In the scuffle, Mr. Waldman's son-in-law was assaulted by KJPS officers as he attempted to rescue his wife.

335. When Mr. Waldman came to their aide, Defendant Witriol intervened and jumped on Mr. Waldman.  When the state police arrived, Witriol had Mr. Waldman arrested on false charges.

336. Due to Defendant Witriol's association with Defendant Village, the state police did not take Mr. Waldman's explanation of the events into account and, therefore, charged him with disorderly conduct and obstructing governmental administration.

337. In early 2011, Mr. Waldman was acquitted of all charges following a jury trial in the Town of Monroe Court

338. In or about August 2009, Eziel Perlstein, whose father is a high-ranking official in Rabbi Zalman Teitelbaum's Brooklyn congregation, passed away early one summer morning.

339. Mr. Perlstein had fully paid his dues to be buried in the main CYL-KJ cemetery in KJ, but CYL-KJ officials refused to allow Mr. Perlstein to be buried unless the family paid the Congregation an additional $50,000.

340. In addition to the $50,000 payment, CYL-KJ also demanded that Mr. Perlstein's father use his authority in the Brooklyn Congregation to proceed to arbitration in a number of disputes being litigated in Brooklyn between the two factions.

341. In facilitation of CYL-KJ's behavior toward the Perlstein family, and in his capacity as KJPS Director and Hatzolah member, Defendant Witriol refused to deliver Mr. Perlstein's body from Hatzolah's custody.

342. Instead of delivering the body, Defendant Witriol retained it on the ambulance the entire day in extreme heat, a serious and egregious violation of Jewish law, which requires that a person be buried as expeditiously as possible after death.

343. In further facilitation of CYL-KJ's behavior toward the Perlstein family, the Village demanded that the family pay what it purported to be a past-due water bill on a KJ property before the body or death certificate would be released.

## IMPROPER FUSION AND EXCESSIVE ENTANGLEMENT OF RELIGION INTO GOVERNMENT AFFAIRS

### *Overlap of CYL-KJ and Village Officials*

344. The Village's Mayor, Defendant Abraham Weider, holds a leadership position within CYL-KJ known as "Rosh H'Khal," which means "Head of the Congregation."

345. In this role, Defendant also exercises authority over the UTA and is subordinate to, and at the direction of, CYL-KJ's Grand Rebbe Aron Teitelbaum.

346. Because of his dual religious and governmental roles, there is an inherent conflict of interest between Defendant Weider's responsibilities as a CYL-KJ official and as Mayor of KJ.

347. During prior litigation with the Village in the late 1990s, Defendant Weider testified under oath that he would not, and could not, enforce secular laws that conflict with his religious obligations and beliefs.  He maintains this same position today.

***Community Rooms – State-Sponsored Religion and Diversion of Funds to CYL-KJ***

348. In or about 2007, the Village enacted a law codified within its Zoning Ordinance called "Community Rooms." See KJ Code § 155-25.

349. The Community Room law provides that: "Before the Planning Board may approve a site plan or subdivision plat containing residential units, such site plan or subdivision plat shall also show . . . a community or rooms suitably located for public assembly purposes." See KJ Code § 155-25(A)(1).

350. The Community Room law provides the specifications for construction of community rooms and also mandates:

> The developer shall provide for the continuing ownership and operation of the community rooms or rooms in accordance with the requirements of this chapter. The developer shall develop and submit an operational plan providing for the proper legal structure to assure the perpetual continuing availability and use of the community room or rooms for recreational, community, charitable, civic or other uses.

See KJ Code § 155-25(A)(2)-(3). The law lists the additional requirements and specifications for the operational plan.

351. The Community Room law states that, in certain instances (e.g., development is less than 30 units or a hardship prevents such provision), "the developer shall pay a fee not less than $5,000 per unit . . . ." See KJ Code § 155-25(A)(1)(d). These funds must be deposited into a "community room fund," which may be used by the Village Board "solely for the provision of community rooms or improvements thereto or other recreational facilities or improvements." See Id. § 155-25(B).

352. With the exception of one community room, which was recently built by a "dissident" developer, the community rooms required under this law are all used as synagogues.

353. As a result, the Village's primary purpose in enacting and enforcing this law, and the law's primary effect, is to require residential developers to build religious structures as a condition of obtaining site plan approval, or to pay cash in lieu thereof to be used for the purpose of building the same.

354. As such, the Community Room law is a law "respecting an establishment of religion," which is prohibited by the First Amendment to the U.S. Constitution, as made applicable to the states by the Fourteenth Amendment.

355. Even if the law does not facially violate the First Amendment, it is being applied in a discriminatory manner because, upon information and belief, every community room in KJ, with the exception of one, is run by CYL-KJ.

356. Thus, the Village, through its community room law, has diverted, and continues to divert, funds and resources to CYL-KJ by use of its municipal authority to enact local zoning laws.

357. The one community room that is not run by CYL-KJ was recently built by Prag Realty, and its development was managed by Lipa Deutsch.

358. The community room was built as part of an 8-9 unit residential development in KJ.

359. The developer built the appropriate number of community rooms as required by the community room law and to the proper specifications.

360. But when Mr. Deutsch tried to obtain Certificates of Occupancy ("CO"), the Village refused until the developer paid $5,000 for each unit in lieu of building community rooms.

361. Mr. Deutsch' explanation to the Village that the community rooms were properly built was not sufficient.

362. The developer was required to obtain counsel to obtain the COs, and after much dispute, the Village reluctantly provided the COs.

### Other Diversions of Funds from the Village to CYL-KJ

363. The Village leases its municipal office space in the building that houses the commercial shopping center on Forest Road.

364. That building is owned by a subsidiary of the UTA, a corporation called UTA of KJ SC, Inc.

365. As such, the Village diverts tax-dollars to CYL-KJ's main private yeshiva in the form of commerce.

366. The KJUFSD also leases space from UTA of KJ SC, Inc.

367. Although the decision to lease space, as opposed to constructing a new facility, was approved by voter referendum, that vote was tainted by conflicts of interest.

368. Ultimately, KJUSFSD's lease transaction was not in the taxpayers' best interests, but was rather a device used to divert tax-dollars to CYL-KJ's religious educational system.

369. In December 2009, the Office of the New York State Comptroller ("OSC") released a report discussing an audit of the KJUFSD it conducted from July 1, 2007 to January 15, 2009 ("OSC Audit Report").

370. The OSC Audit Report found serious deficiencies in the KJUFSD Board's internal financial controls and activities.  Specifically, it concluded that the District's lease transaction and other commercial activities with the UTA were tainted by conflicts of interest.

371. As explained by the OSC Audit Report, two KJUFSD school board members – its President and Vice President – were also officers and directors of UTA of KJ SC, Inc., the District's proposed landlord in the transaction.

372. However, the School Board did not disclose this conflict of interest to voters before putting the lease proposal to a referendum.

373. Further, as noted by the OSC Audit Report, the lease transaction will cost approximately $38 million over the 30 year lease term, as opposed to the $35 million required to build a new facility and pay interest on the bond necessary to facilitate the construction.

374. Aside from costing $3 million less, the latter option would also result in the District owning the asset free and clear at the end of 30 years.

375. The OSC Audit Report concluded that "[d]ue to the variance in the total cost to District taxpayers and the two Board members' failure to recuse themselves from matters involving UTA of KJ SC, Inc., there is a risk that Board decision involving the lease agreement . . . may have been influenced by the potential divided loyalties of the two Board members and may not always have been made solely in the best interests of the District."

376. In addition to the OSC, the United States Department of Education conducted an audit of the KJUFSD between September 1, 2008 and August 31, 2009.

377. The results of that federal audit were released in a report dated February 2, 2011.

378. According to that report, the audit found that KJUFSD misused approximately $467,567 of Title I funds during the course of the audit period.

379. Of that amount, $276,443 of Title I funds were used to pay lease payments under the lease tainted by conflict as found by the OSC.

380. The Department of Education noted that those funds, and the additional $5.2 million of Title I money that would be used for that same purpose over the remaining life of the lease, "could be better used to serve the students of Kiryas Joel."

381. The remaining $191,124 consisted of undocumented, or improperly documented, overtime salary for eight District employees.

### *Indifference to a Properly-run Municipal Government*

382. The Village engages in certain conduct that demonstrates its indifference to properly running its government, which suggests that, aside from supporting CYL-KJ, the Village has no other legitimate purpose.  If it did, it would take its responsibility as a municipal government seriously and not engage in such conduct.

383. The Village does not properly or seriously enforce its building code.

384. The Village's Code Enforcement Official, Isaac Goldberger, has absolutely no credentials and is not qualified to hold his position.

385. Upon information and belief, Mr. Goldberger is Szegedin's uncle.

386. Despite state record retention requirements, the Village does not properly keep building department records, and, in some cases, has no records at all.

387. Responses to FOIL requests to the New York State Department of State reveal that, despite the State's requirement that every municipality file an annual report demonstrating its compliance with minimum state building code standards, KJ has filed only one such report since 1990.  That report was filed in 2007 by John Brown, KJ's building inspector at that time.

388. When former KJ building inspector Lawrence Rossini ordered the power shut off to a UTA building because of a fire there, Defendant Weider was furious that the religious school

was affected in such a manner.  In so acting, Defendant Weider ignored the inherent safety issues he was obliged to respect as Mayor and instead illustrated the overarching importance of his role as CYL-KJ's Rosh H'Khal to keep the school open and running despite the risks.

389. When Mr. Rossini informed Mr. Goldberger that Plaintiff Joseph Waldman was coming to the Village office one day, Mr. Goldberger was very upset and told Mr. Rossini that Waldman, a "dissident," was not allowed in the Village offices.  When Mr. Rossini insisted that the Village office was a public building and that Mr. Waldman was entitled to enter it, Mr. Goldberger got angry and disappeared when Mr. Waldman showed up.

390. Mr. Rossini was instructed by his superiors in the Village government to stay away from the community rooms and mikvahs and otherwise to "not look so hard" for violations.

391. When Mr. Rossini explained to his superiors what proper code enforcement entailed and refused to abdicate his duties as they suggested, the Village terminated him.

392. In 2004, the Village enacted a law entitled "Library." See KJ Code Chapter 83.

393. That law, through its enactment, purportedly created a public library in the Village. See KJ Code § 83-2 ("There is hereby established the Village of Kiryas Joel Public Library, subject to the provisions of the Education Law.").

394. The law also provides for the management and operation of the Library by a Library Board of Trustees and for the permissible financial activities in which that Board may engage.

395. The library does not seem to exist and, if it does, no "dissident" knows where it is and thus cannot use it.

396. The Village failed to respond to a FOIL request seeking all of the pertinent information regarding the Library, including, inter alia, its location, the identification of its Board members, and minutes from its Board's meetings.

397. In response to a FOIL request to the New York State Comptroller's Office for every report filed by the Village of Kiryas Joel Public Library as required by the General Municipal Law, the Comptroller's Office responded that it had no such reports on file or any other record of the Library's existence.

398. If the KJ Public Library exists, then it is being hidden from the "dissidents" and operated in a manner inconsistent with state law.

399. If the KJ Public Library does not exist, then the Village has not acted in accordance with its own law, which purported to create the library.

400. In preparation of drafting this Complaint, this law office submitted several requests to the Village under New York's Freedom of Information Law.  The Village has failed to respond to any of these FOIL requests, in blatant disregard of its legal obligation to do so.

401. Over past two years, certain Village "dissidents," or others acting in aid thereto, have submitted dozens of FOIL requests to the Village.  The Village has failed to respond to any of these FOIL requests, in blatant disregard of its legal obligation to do so.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE EQUAL PROTECTION CLAUSE
### (42 U.S.C. §§ 1983; U.S. Const., amend XIV)

402. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 401, above.

403. By dint of their conduct as set forth in this Complaint, and acting under color of state law, the Municipal Defendants have deprived, and continue to deprive, Plaintiffs, and others similarly situated, of the equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution, on the basis of their religious beliefs and practices.

404. Defendants' conduct, as set forth in this Complaint, has directly and proximately caused Plaintiffs to suffer economic and noneconomic injuries.

405. In violating Plaintiffs' rights, as set forth in this Complaint, Defendants acted willfully, maliciously, and with a reckless and wanton disregard for Plaintiff's federally protected rights.

### COUNT II
### CONSPIRACY TO VIOLATE THE EQUAL PROTECTION CLAUSE
### (42 U.S.C. § 1985; U.S. Const., amend. XIV)

406. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 405, above.

407. By dint of their conduct as set forth in this Complaint, and acting under color of state law, the Municipal Defendants and Congregational Defendants have conspired, and continue to conspire, to deprive Plaintiffs, and others similarly situated, of the equal protection of the laws,

as guaranteed by the Fourteenth Amendment to the United States Constitution, on the basis of their religious beliefs and practices.

408. Defendants' conduct, as set forth in this Complaint, has directly and proximately caused Plaintiffs to suffer economic and noneconomic injuries.

409. In violating Plaintiffs' rights, as set forth in this Complaint, Defendants acted willfully, maliciously, and with a reckless and wanton disregard for Plaintiff's federally protected rights.

**COUNT III**
<u>VIOLATION OF THE FREE EXERCISE CLAUSE</u>
<u>(42 U.S.C. §§ 1983; U.S. Const., amends. I, XIV)</u>

410. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 409, above.

411. By dint of their conduct as set forth in this Complaint, and under color of state law, the Municipal Defendants have unlawfully infringed the "dissidents'" right to freely exercise their religion as guaranteed by the First Amendment, and made applicable to the states by the Fourteenth Amendment, to the United States Constitution.

412. Defendants' conduct, as set forth in this Complaint, has directly and proximately caused Plaintiffs to suffer economic and noneconomic injuries.

413. In violating Plaintiffs' rights, as set forth in this Complaint, Defendants acted willfully, maliciously, and with a reckless and wanton disregard for Plaintiff's federally protected rights.

**COUNT IV**
VIOLATION OF THE ESTABLISHMENT CLAUSE
(42 U.S.C. §§ 1983; U.S. Const., amend. I & XIV)

414. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 413, above.

415. By dint of the allegations set forth in this Complaint, the Village of Kiryas Joel is so infused by and entangled with religion that its very existence violates the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment.

416. Due to of the excessive infusion and entanglement of religion into the Village government's affairs, as set forth in this Complaint, the State of New York's recognition of the Village's municipal status, and its provision to the Village of authority attending such municipal status by operation of state law, violates the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment.

417. Defendants' conduct, as set forth in this Complaint, has directly and proximately caused Plaintiffs to suffer economic and noneconomic injuries.

418. In violating Plaintiffs' rights, as set forth in this Complaint, Defendants acted willfully, maliciously, and with a reckless and wanton disregard for Plaintiff's federally protected rights.

**COUNT V**
VIOLATION OF RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT
(42 U.S.C. § 2000cc *et seq.*)

419. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 418, above.

420. Through its Planning Board and ZBA, the Village has selectively imposed zoning requirements on Plaintiff Cong. Bais Yoel on the basis its members' religious beliefs and practices.

421. The Village has required Cong. Bais Yoel to submit Site Plans for Village Planning Board approval before it will allow the Congregation to use its residentially zoned property for religious purposes while, at the same time, not imposing the same requirement on the forty to fifty other similarly zoned residential properties currently used for religious purposes by CYL-KJ members.

422. The Village's inability to properly constitute a valid and impartial Planning Board or ZBA, which is not directed by the edicts of Aron Teitelbaum and CYL-KJ leadership, has imposed a substantial burden on Cong. Bais Yoel's ability to use its property for religious purposes.

423. The Village's biased and discriminatory imposition and implementation of its zoning regulations – particularly its site plan regulations and community room law – unreasonably limits "dissident" religious assemblies, institutions, and structures within the Village.

424. The Planning Board and ZBA are instrumentalities of the Village and, upon information and belief, the Village receives Federal financial assistance.

425. Defendants' conduct, as set forth in this Complaint, has directly and proximately caused Plaintiffs to suffer economic and noneconomic injuries.

426. In violating Plaintiffs' rights, as set forth in this Complaint, Defendants acted willfully, maliciously, and with a reckless and wanton disregard for Plaintiff's federally protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Assume jurisdiction of this action;

B.  Empanel a jury to hear all claims;

C.  Adjudge and declare that the Village of Kiryas Joel, through its government officers, employees, and agents, applies and enforces its laws in a selective and discriminatory manner on the basis of religion in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

D.  Adjudge and declare that the Village of Kiryas Joel, through its government officers, employees, and agents, applies and enforces its laws in a selective and discriminatory manner on the basis of religion in violation of the Free Exercise Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment;

E.  Adjudge and declare that the government affairs of the Village of Kiryas Joel are inherently infused and entangled with religion – in particular, religion as practiced by Defendant CYL-KJ – such that its very existence and operation as a municipal corporation under the laws of the State of New York violates the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment;

F.  Adjudge and declare the that the State of New York's recognition of the Village of Kiryas Joel's municipal status, and its provision of public funds and resources to it, violates the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment to the United States Constitution;

G.  Permanently enjoin Defendant Cesar A. Perales, in his official capacity as acting New York State Secretary of State, and his successors to that Office, from recognizing the municipal status of the Village of Kiryas Joel;

H.  Order the Village of Kiryas Joel dissolved, and its municipal affairs assumed by the Town of Monroe;

I.  If this Court refuses to order the Village of Kiryas Joel dissolved or its municipal status disregarded by the State of New York, order a permanent injunction:

 a.  Enjoining the Village of Kiryas Joel and its government agents from (1) enforcing its laws and ordinances in a selective or discriminatory manner; (2) enacting any local law or ordinance that discriminates on the basis of religion, or on any other basis; and (3) enacting any local law or ordinance that violates the Establishment or Free Exercise Clauses of the First Amendment of the United States Constitution, as made applicable to the states by the Fourteenth Amendment to the United States Constitution;

 b.  Enjoining any officer, director, or high-ranking official of CYL-KJ, or of any successor or assignee thereof, from (1) holding any Village government office, including but not limited to the offices of Mayor and Trustee, for a period of twenty-five years; and (2) from sitting on the Board of Education of the Village of Kiryas Joel Union Free School District for a period of twenty-five years;

 c.  Ordering Defendant Abraham Weider to relinquish his current office of Mayor of the Village of Kiryas Joel and enjoining him from holding any Village office indefinitely;

 d.  Ordering Gedalye Szegedin to relinquish his current office of Village of Kiryas Joel Administrator and Clerk and all offices that he holds incidental to that position,

including but not limited to Village Assessor and Chief Election officer, and enjoining him from holding any Village office indefinitely;

    e.   Ordering Defendant Moses Witriol to relinquish his office of Director of the Village of Kiryas Joel Department of Public Safety and enjoining him from holding any Village office indefinitely;

    f.   Ordering Defendants Jacob Reisman, Moses Goldstein, Jacob Freund, and Samuel Landau to relinquish their current offices of Village of Kiryas Joel Trustee and enjoining them from holding any Village office indefinitely;

    g.   Ordering a special Village election to be held as soon as practical after entry of this Court's Order and appointing a special master or independent monitor to (1) establish single-member voting districts within the Village; (2) select and appoint interim officers to replace those offices left vacant as a result of this Court's Order; (3) select a neutral site in which the special Village election will be held; and (4) oversee the special Village election when ultimately held;

    h.   Ordering that all Village elections, for a period of ten years following entry of this Court's Order, be overseen by a special master or independent monitor and be held at a location chosen by such master or monitor;

J.   If this Court refuses to order the Village of Kiryas Joel dissolved or its municipal status disregarded by the State of New York:

    a.   Adjudge and declare that the Village's selective enforcement of its zoning regulations with respect to Plaintiff Cong. Bais Yoel, and its inability to properly constitute an impartial Planning Board or ZBA, violates the Religious Land Use and Institutionalized Persons Act; and

    b. Order the Village to grant Plaintiff Cong. Bais Yoel the zoning approval necessary to reopen its shul at the Rebitzon's house;

    K. Appoint a special master or independent monitor to oversee and monitor Defendants' implementation of the requirements of this Court's Order

    L. Retain jurisdiction of this case until Defendants have fully complied with the Orders of this Court, and until there is a reasonable assurance that Defendants will continue to comply in the future;

    M. Award Plaintiffs compensatory and punitive damages;

    N. Award Plaintiffs the costs of this suit, including reasonable attorneys' fees and litigation expenses, in accordance with 42 U.S.C. § 1988; and

    O. Award Plaintiffs such other and further relief as the Court deems just and proper.


Dated: June 24, 2011
       Goshen, New York

                        Respectfully submitted,

                        SUSSMAN AND WATKINS

                        By: _____
                              Michael H. Sussman (3497)
                              Attorneys for Plaintiff
                              55 Main Street
                              Goshen, NY 10924
                              (845) 294-3991